United States Court of Appeals, Eleventh Circuit.

No. 95-9591.

Jerry Ricky CLAYTON, Susan Clayton, Plaintiffs-Appellants,

State of Georgia Department of Administrative Services, Intervenor-Plaintiff-Appellant,

v.

Johnny E. TRAVIS, Defendant-Appellee.

April 7, 1997.

Appeal from the United States District Court for the Northern District of Georgia. (No. 4:94-CV-1224-HLM), Harold L. Murphy, District Judge.

Before ANDERSON and CARNES, Circuit Judges, and STROM[*], Senior District Judge.

ANDERSON, Circuit Judge:

In this diversity case applying Georgia law, appellants/plaintiffs Jerry Ricky Clayton, a traffic signal technician for the Georgia Department of Transportation ("DOT"), Susan Clayton, and the State of Georgia Department of Administrative Services ("GDAS")[1] appeal from a jury verdict for defendant-appellee, Johnny E. Travis, in the United States District Court for the Northern District of Georgia. Travis was employed by Knoxville Door and Millworks, Inc. Plaintiffs brought suit against Travis for injuries sustained by Clayton when the aerial lift, or

---

[*]Honorable Lyle E. Strom, Senior U.S. District Judge for the District of Nebraska, sitting by designation.

[1]Pursuant to O.C.G.A. § 34-9-11.1, the GDAS intervened in the Claytons' suit against Travis based upon its workers' compensation subrogation claim. The GDAS asserted against Travis the same claims as those asserted by the Claytons.

bucket,[2] which Clayton was occupying was struck by a tractor trailer operated by Travis.

## I. FACTS[3]

On September 16, 1993, Clayton[4] was sent by his supervisor to the intersection of Highway 92 and 120 Connector to install red strobe lights[5] onto newly erected traffic signal heads. Clayton had helped to install the new traffic signals during the two days prior to the accident. The signals were being installed because heavy traffic flow made it difficult for drivers to negotiate the intersection.

When Clayton first arrived at this intersection, he and co-worker Terry Rutledge measured the height of the bottom of the newly installed signal heads, and found that they were between 14 and 141/2 feet above the ground. DOT regulations require the traffic signals to be at least 17 feet from the ground. Clayton pulled his boom truck off the roadways, into the northwest quadrant of the intersection, and attempted to raise the signal heads. This effort was unsuccessful, however, because the anchors of the span pole, the pole to which the signals' wires were attached, began to

---

[2]A bucket is located at the end of the extension arm of a boom truck; this truck is often referred to as a "cherry picker."

[3]We present the facts with inferences in favor of the jury verdict.

[4]At the time of the accident, Clayton had been employed by the DOT for roughly four years, had driven a cherry picker for approximately three years, and had worked as a signal technician for almost two years.

[5]A red strobe light, which flashes when the red signal on the traffic light is on, is a temporary measure used to draw drivers' attention to new signals.

come out of the ground.  Clayton and Rutledge then called a derrick truck to the scene to place new anchors onto the span pole.  When the derrick truck arrived, an installation repair crew, along with Rutledge, gathered about twenty-five feet away from Highway 92 in a slope-like hole or ditch and began to place new anchors onto the span pole.  These DOT workers were not visible to drivers headed south on Highway 92.

During this time, with the cherry picker still located off the road in the northwest quadrant, Clayton began the installation work on the traffic signal above the southbound lane.  Clayton got into the bucket, and moved the extension arm and bucket out over the southbound lane of traffic and began work on the signal.  The traffic was heavy, and at the time of the accident there was a flow of traffic in the southbound lane in which Travis was traveling.  As Travis drove his tractor trailer southbound on Highway 92 and into the intersection, the top of his truck struck the bucket of the cherry picker, knocking Clayton to the ground.

Travis' truck was 13 feet 5 inches high.  The testimony indicated that there was a standard minimum clearance of 15 feet, and that truck drivers could assume for example that traffic signals would be at least 15 feet high.  The traffic signal on which Clayton was working was 14 to 14 1/2 feet high;  Clayton himself had measured it.  According to Rutledge's testimony, the bottom of Clayton's bucket was 13 to 13 1/2 feet high.  Drexel Homes, a traffic signal supervisor, testified that he had suggested to Clayton before he went up in the bucket that it might be a good idea to wait until the traffic signals were raised to the proper

height.  Clayton himself testified that he knew that DOT required the bottom of traffic lights to be 17 feet above the road so that they would not be struck by vehicles or objects protruding from vehicles traveling on the road.  Clayton also stated that he was aware that one of the biggest dangers of working in an aerial lift was being struck by a vehicle in the traffic below or an object protruding therefrom.  There was also testimony to the effect that the lane should have been closed before Clayton began such work because the signal lights were low.  However, Clayton did not use flagmen to divert traffic and close the southbound lane.  Nor did Clayton use a spotter;  spotters for aerial lifts stand by the roadway and watch for traffic such as tall trucks which may be a problem.

While Clayton was working in the bucket, the traffic signals in the intersection were flashing yellow.  Cones surrounded the boom truck, and the truck's revolving amber light was on.  However, the truck was off of the roadway, and there was no strobe light either on the bucket or the arm of the boom truck.  Clayton was wearing a yellow hard hat and an orange vest, but was not wearing the safety belt recommended by the owner's manual and discussed at safety meetings.

Expert testimony indicated that Travis was traveling at a speed of 30 miles per hour.  The posted speed at the intersection was 45 miles per hour, and an advisory sign posted by DOT at the time recommended a speed of 35 miles per hour.  The sight distance for a vehicle approaching the intersection from Travis' direction was approximately 750 feet.  Travis testified that he did not see

the bucket until he was underneath it, and was not aware that Clayton was in the bucket until after the accident. The jury returned a verdict for the defendant Travis.

## II. ISSUE

The only issue we address on appeal is appellants' contention that the district court erred in giving the jury a charge on assumption of risk.[6] With respect to this issue, the only question preserved for appeal, *see* note 8 *infra,* is whether the jury was presented with enough evidence to provide a basis for an assumption of risk charge.

## III. *DISCUSSION*

In this diversity action, we apply Georgia law. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under Georgia law, a plaintiff assumes a risk when he "deliberately chooses an obviously perilous course of conduct" "with full appreciation of the danger involved." *Whitehead v. Seymour,* 120 Ga.App. 25, 169 S.E.2d 369, 370 (1969) (syllabus by the court). [7] This affirmative defense bars a plaintiff from recovering on a negligence claim if the defendant establishes the following: "(1) [the plaintiff] had actual knowledge of the danger; (2) [the plaintiff] understood and appreciated the risks associated with such danger; and, (3) [the plaintiff] voluntarily exposed himself

---

[6]The other argument raised on appeal by the Claytons is without merit and warrants no discussion.

[7]While Georgia law provides the substantive definition of assumption of risk, federal law governs the quantity and quality of proof necessary to make out a case for submission to a jury. *Hull v. Merck & Co., Inc.,* 758 F.2d 1474, 1476 (11th Cir.1985). This latter, procedural rule is easily applied in this case, and will not be discussed further.

to those risks." *Vaughn v. Pleasent,* 266 Ga. 862, 471 S.E.2d 866, 868 (1996).

In *Vaughn,* which was decided subsequent to this case being tried, the Supreme Court of Georgia clarified that for a defendant to assert this affirmative defense, a plaintiff not only must have "actual" knowledge, but also a "subjective" knowledge of the risk:

> The knowledge that a plaintiff who assumes a risk must subjectively possess is that of the specific, particular risk of harm associated with the activity or condition that proximately causes the injury. (footnote omitted). The knowledge requirement does not refer to a plaintiff's comprehension of general, non-specific risks that might be associated with such conditions or activities. (footnote omitted).

*Vaughn,* 266 Ga. 862, 471 S.E. at 868. Thus, in addition to looking objectively at whether there was evidence to infer that Clayton assumed a risk, this court must determine whether there was some evidence to support an inference that subjectively the risk was apparent to Clayton.

Relying on *Vaughn,* appellants argue that no evidence was presented at trial to show that Clayton assumed anything beyond a general, non-specific risk. We disagree. In *Vaughn,* police officer Vaughn brought suit against a truck driver who had pulled in front of him when he was responding to an emergency. At the time of the accident, Vaughn was traveling in excess of the speed limit with his siren sounding and his blue light and headlamps flashing. 266 Ga. 862, 471 S.E.2d at 867. Upon approaching the intersection where the accident occurred, Vaughn observed the following: a green light; stopped cars on the opposite side of the intersection, which he presumed were yielding to him; and, near the intersection on the right side of the roadway, a stopped

trailer whose signal lights were not activated. *Id.* Believing that the trailer was parked, Vaughn crossed the center lane of the road to circumvent the trailer and proceeded through the intersection. At that time, Vaughn realized the trailer was hitched to a blue pickup truck which was turning left into his path. The two cars collided. *Id.*

The *Vaughn* court held that it was error for the trial court to charge the jury with assumption of risk, as no evidence was presented at trial to prove that Vaughn had "actual knowledge that [the defendant] intended to turn left in front of him, and nonetheless knowingly and voluntarily continued to travel in excess of the speed limit in emergency fashion through the intersection." 266 Ga. 862, 471 S.E.2d at 869. The *Vaughn* court's ruling centered around the fact that the police officer, in crossing the center lane to proceed through the intersection, had no prior knowledge that a truck would turn left into his path: the trailer's signal lights were not lit or flashing, and the pickup truck was not visible until the officer had crossed the center lane. In addition, *Vaughn* cited *Beringause v. Fogleman Truck Lines, Inc.,* 200 Ga.App. 822, 823, 409 S.E.2d 524 (1991), where, in finding that an officer driving in his own lane in a convoy did not assume the risk of a head-on collision, the court gave weight to the safety precautions used by the officer: "by his use of flashing emergency lights, he was insisting that other drivers use care to watch for him and avoid hitting his vehicle." *Vaughn,* 266 Ga. 862, 471 S.E.2d at 868-89 (quoting *Beringause,* 200 Ga.App. at 823, 409 S.E.2d 524).

In arriving at its conclusion, the *Vaughn* court distinguished *McCrimmons v. Cornell-Young Co.,* 171 Ga.App. 561, 320 S.E.2d 398 (1984), where "there was some evidence ... that the injured plaintiff knew of the specific danger associated with the activity that caused his injury, and appreciated the specific risk of harm that he was subjecting himself to by engaging in those activities." 266 Ga. 862, 471 S.E.2d at 869 n. 12. In *McCrimmons,* the trial court had granted summary judgment for the defendant refining company, who was being sued by a contract employee injured on its premises. The plaintiff suffered serious injuries to his face and head when a split-rim tire assembly exploded in his face while he was changing a flat conveyor tire without safety equipment. 171 Ga.App. 561, 320 S.E.2d at 399. In an alternative holding, the court held that the plaintiff "anticipated the risk inherent in the work he was doing and knowingly assumed the risk." 171 Ga.App. 561, 320 S.E.2d at 401. Critical to the court's holding was the fact that appellant, before the accident, was aware that there was a risk that the assembly could explode in his face:

> Appellant [in his deposition] ... explained that he was aware of the danger inherent in changing tires the size of the one which he was working without using safety equipment; that if the assembly exploded it could "blow your head off if you ain't careful"; that before working for Macon Bandag he always used the safety equipment; that he "went against the odds" and did the work for Macon Bandag without safety equipment because he needed the job.

171 Ga.App. 561, 320 S.E.2d at 400. Under the *Vaughn* analysis, this plaintiff not only assumed the general risks of working with large tires, but assumed the specific risk of having an assembly explode without the protection of safety equipment.

Also instructive is *Hull v. Merck & Co., Inc.,* 758 F.2d 1474

(11th Cir.1985), where this court, applying Georgia law, upheld a jury charge on assumption of risk. In *Hull,* the operator of a chemical plant was sued by Hull, a contract employee who contracted leukemia after being exposed to chemicals while working on the replacement of work lines at the plant. Before commencing work at the plant, Hull was informed that the defendant chemical company planned to continue operating its factories throughout the replacement activities. *Id.* at 1474. In addition, Hull also received cautionary instructions to wear safety equipment, including rubber boots, pants, coats, gloves, goggles, and masks. After a few days of working at the plant, Hull ceased wearing the protective gear. *Id.* As a result, he regularly breathed chemical fumes and allowed liquid to spill on his clothing and body. While the pipes were supposed to carry only a two percent solution of waste, on one particular occasion an accidental spill caused Hull to breathe fumes which contained an 80 to 85 percent solution of waste. *Id.* at 1475.

On appeal, Hull claimed that the trial court erred in charging the jury on assumption of risk. This court, noting that "perfect knowledge [of the nature and extent of the threat posed] is not necessary" for the assumption of risk doctrine, held that there was "ample evidence" to justify the charge on assumption of risk: Hull knew that the plant planned to continue its factory operations during the replacement activity; knew that adequate safety gear was recommended and supplied by his employer; and, "knew from long experience that the handling of waste chemicals warranted protective measures, and that coping with a continued flow of waste

warranted an even greater degree of caution."  *Id.* at 1477. Furthermore, this court noted that, subsequent to his exposure after the accidental spill, he continued to expose himself for another month.  Id.

In arguing that there was no evidence to support an inference that Clayton subjectively assumed a risk, appellants point to the fact that Clayton was not facing Travis' direction at the time he was struck.  While *Vaughn* does require specific knowledge of a risk, we do not think that it requires the specificity contended by appellants, i.e., that Clayton must have actually seen Travis' tractor trailer approaching the intersection, and then must have assumed the risk of being hit by that particular vehicle.  Rather, *Vaughn* cited with approval *McCrimmons* which applied the assumption of the risk defense where the specificity of the risk assumed was comparable to that in the instant case.

In this case, Clayton measured the actual height of the traffic signals and knew that they were 14 to 141/2 feet high.  The jury could infer that Clayton knew that the bucket in which he undertook his work was lower than that;  this would have been obvious to him as he worked.  Moreover, we know from the evidence that the bucket was in fact lower;  the bucket must have been as low as 13 feet 5 inches because it was hit by Travis' truck of that height.  The jury could also infer that Clayton was aware of the specific danger of being hit by a vehicle traveling below if he got his bucket too low.  He testified that he knew that the DOT required signal lights to be 17 feet high so they would not be hit by vehicles.  He also testified that he knew that a major hazard of

his job was being struck by a vehicle.  Indeed, a suggestion had even been made to him before he went up in the cherry picker that it might be better to wait until the traffic signals were raised to their proper, 17 foot height.  Finally, the jury could infer that, at the time he undertook this work, Clayton knew that the traffic on the highway was heavy.

Notwithstanding the foregoing knowledge, Clayton moved himself and his bucket out over the oncoming flow of traffic and began working at the low level he knew to be dangerous, without either diverting the traffic or even using a spotter to warn him of tall trucks.  We believe that the risk assumed by Clayton—i.e., the known risk of being hit by an oncoming truck when he got so low—is at least as specific as that in *McCrimmons,* where the plaintiff knowingly assumed the risk that the tire assembly would explode while changing the tire.  We conclude, based on the evidence presented, that the jury could have found that Clayton sufficiently contemplated the obvious danger that an oncoming truck might hit him when he lowered his bucket so low over the flow of traffic.[8]

## IV. CONCLUSION

For the foregoing reasons, we do not find that the district

---

[8]Appellants also argue that certain statutory "rules of the road" operate to make the assumption of the risk charge inappropriate.  We note that the district court did instruct the jury with regard to these "rules of the road."  However, appellants did not argue to the district court that these rules of the road somehow operated to make the assumption of risk charge inappropriate, or were otherwise relevant to the assumption of risk issue.  We decline to entertain this argument raised for the first time on appeal.  Similarly, appellants argue for the first time on appeal that Clayton had a special status as a workman employed in working on the highways and that this special status is relevant to the assumption of risk issue.  We also decline to entertain this argument.

court erred in charging the jury with assumption of risk.

AFFIRMED.